**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| KATHRYN HEUERTZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 19-CV-02756 – KHV-GEB |
| | ) | |
| CAREGIVERS HOME HEALTH LLC, | ) | |
| CAREGIVERS HOLDING COMPANY, | ) | |
| CAREGIVERS OF KANSAS, INC., AND | ) | |
| CAREGIVERS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THE**
**MOTION FOR SUMMARY JUDGMENT**

COME NOW the Defendants, Caregivers Home Health LLC, Caregivers Holding Company, Caregivers of Kansas, Inc., and Caregivers, Inc., by and through its attorneys of record, Stephen D. Lanterman and the law firm of SLOAN, EISENBARTH, GLASSMAN, MCENTIRE & JARBOE L.L.C., and move for summary judgment on all of Plaintiff's claims. In support of this motion, the Defendants offer the following:

***Summary of the Argument***

Plaintiff Heuertz was fired by Caregivers, Inc. because she was not meeting basic employment expectations and had excessive absences. Had Heuertz improved in the performance of her duties and improved her work attendance, Caregivers, Inc. would not have terminated her employment. Heuertz cannot prove a prima facie case for any of her claims against Caregivers, Inc. Therefore, all those claims fail as a matter of law and summary judgment is warranted.

Plaintiff Heuertz has also asserted the same claims against Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc.  None of these entities have been an employer in any capacity of Heuertz and are not proper parties to this litigation. Because these entities were not her employer and cannot be liable for any of Heuertz's claims, summary judgment is warranted for these Defendants.

## STATEMENT OF UNCONTROVERTED FACTS

### Facts Related to Heuertz's Employment with Caregivers, Inc

1. Ed Schulte, Jean Sanchez, Patty Fisher, and Heather Strecker participated in Ms. Heuertz's employment interview.  (Exh. 1, Schulte Depo. p. 57 ln 24-25 – p. 58 1-8)

2. Heather Strecker was asked to sit in for Ms. Heuertz's employment interview with Caregivers, Inc. because Heather Strecker can get a good feel of whether someone is a good fit for the job.  (Exh. 2, Strecker Depo., p. 47 ln 8-17)

3. During Ms. Heuertz's interview, Heather Strecker got the impression that it was kind of hard for her to focus and that worried her that auditing was not a good fit for Ms. Heuertz's employment. (Exh. 2, Strecker Depo., p. 48 ln 13-24)

4. After the interview, Heather Strecker told Jean Sanchez her concerns that Ms. Heuertz was not a good fit for the auditing position.  (Exh. 2, Strecker Depo., p. 49 ln 2-12)

5. Ms. Heuertz was recommended for the employment interview by her friend Becky Broxterman, another Caregiver employee.  (Exh. 3, Fisher Depo., p. 61 ln 16-18)

6. The recommendation by Ms. Broxterman gave Ms. Heuertz "a really big benefit of the doubt" that Ms. Heuertz would work out for Caregivers.  (Exh. 3, Fisher Depo., p. 61 ln 18-21)

7.  After the interview with Ms. Heuertz, Jean Sanchez and Ed Schulte also had concerns about whether Ms. Heuertz was a good candidate for the position, however, both felt that because she was referred by someone in their office who was doing a very good job they were willing to give Ms. Heuertz a chance.  (Exh. 1, Schulte Depo. p. 58 9-15)

8.  The decision to hire Ms. Heuertz was made by Ed Schulte alone or in combination with Jean Sanchez.  (Exh. 1, Schulte Depo. p. 58 16-24)

9.  Ms. Heuertz' first day of employment was December 3, 2018. (PTO Stip. Fact 1, Doc 108)

10. Throughout Ms. Heuertz's employment, her immediate supervisor was Patty Fisher. (PTO Stip. Fact 15, Doc 108)

**Facts related to Caregivers, Inc. employment policies and discipline procedures**

11. Ms. Heuertz's employment was "at will" employment. (PTO Stip. Fact 2, Doc 108)

12. Ms. Heuertz received the employee handbook for Caregivers when she was hired.  (Exh. 4, Sanchez Depo., p. 144 ln 2-6)

13. Ms. Heuertz electronically signed a receipt for the Employee Handbook on December 3, 2018, in which Ms. Heuertz acknowledged "receipt of Caregivers Home Health's employee handbook" and acknowledged that her employment was not for a set period of time and that she could terminate her employment or be terminated for "any reason with or without cause" and that her employment was "at will." (PTO Stip. Fact 3, Doc 108)

14. The Caregivers Employee Handbook contains a Disclaimer which states that "these policies are only guidelines.  They do not represent an employment contract and should not be viewed as such." (Exh. 5, Depo. Exh. 27; Exh. 4, Sanchez Depo., p. 144 ln 7-11)

15. Ms. Heuertz indicated that she received this Disclaimer by signing it on December 3, 2018. (Exh. 5, Depo. Exh. 27; Exh. 4, Sanchez Depo., p. 144 ln 2-6)

16. Defendants do not have a written policy establishing a probationary period during the first 90 days of employment. (PTO Stip. Fact 26, Doc 108)

17. Caregivers, Inc. tends to be a little more formal with disciplinary procedures with longer standing employees, as opposed to employees who are just hired, especially those within their first 90 days of employment. (Exh. 1, Schulte Depo. p. 83 7-19)

18. The Caregivers Employee Handbook lists "excessive absences or lateness" as an example of an offense that an employee can be disciplined for.  (Exh. 6, Depo. Exh. 26, p. 4)

19. The Caregivers Employee Handbook states that possible disciplinary actions include "counseling, formal warnings, suspension and discharge" and that "the specific action to be taken will depend on the nature of the offense, the circumstances and your previous record." (Exh. 6, Depo. Exh. 26, p. 4)

20. Caregivers does not have a formal policy to require progressive discipline of employees; supervisors can take situations on a case-by-case basis.  (Exh. 4, Sanchez Depo., p. 27 ln 11-21 & p. 70 ln 2-10;)

21. The employee handbook states that unnecessary absenteeism and lateness are expensive and place an unfair burden on other employees. (Exh. 6, Depo Exh. 26; Exh. 4, Sanchez Depo., p. 63 ln 7-11)

22. An employee hired at Caregivers, Inc. is not allowed to take PTO leave until after the employee has completed the first 90 days of employment.  (Exh. 4, Sanchez Depo., p. 54 ln 6-12)

23. During her employment, Ms. Heuertz did not receive any written disciplinary action. (PTO Stip. Fact 16, Doc 108)

24. During her employment, Ms. Heuertz never received a formal write-up or improvement plan. (PTO Stip. Fact 17, Doc 108)

25. Heather Strecker did not have an expectation that the concerns over Ms. Heuertz's attendance and work performance would be provided to Ms. Heuertz in writing because she hadn't been employed very long and she would not have expected a need for formal written discipline.  (Exh. 2, Strecker Depo., p. 94 ln 17-25)

### Facts related to Heuertz's job performance and absences

26. Office staff at Caregivers, Inc. cover a period between 8:00am and 5:00pm and supervisors allow flexibility in a window of starting and ending the staff's shift.  (Exh. 4, Sanchez Depo., p. 94 ln 3-13; Exh. 3, Fisher Depo., p. 49 ln 1-22)

27. Office staff scheduling is flexible to accommodate an employee who wants to come in to work early and leave early, such as 7:30-4:30.  (Exh. 4, Sanchez Depo., p. 95 ln 1-7)

28. Patty Fisher was in charge of the day-to-day supervision responsibilities over Ms. Heuertz. (Exh. 4, Sanchez Depo., p. 79 ln 12-14)

29. Patty Fisher and Heather Strecker were responsible for Ms. Heuertz's training (Exh. 4, Sanchez Depo., p. 80 ln 2-5 & p. 103 ln 4-8)

30. Ms. Heuertz identified that her main job duties at Caregivers, Inc. was to audit completed charts and some filing.  (Exh. 7, Heuertz Depo., p. 86 ln 11-16)

31. During Ms. Heuertz's employment with Caregivers, Inc., Jean Sanchez considered her a probationary employee. (Exh. 4, Sanchez Depo., p. 144 ln 18-24)

32. Jean Sanchez's understanding of the status of a probationary employee is that if a person is not able to perform their job in the way needed for the office, their employment may be terminated.  (Exh. 4, Sanchez Depo., p. 144 ln 25 - p. 145 ln 1-6)

33. Jean Sanchez testified that she looks at an employee's performance for the first 90 days of their employment to determine whether they will be able to perform the job.  (Exh. 4, Sanchez Depo., p. 145 ln 7-12)

34. Jean Sanchez's assessment of Ms. Heuertz's job performance was that "she did not appear to be grasping some of the basic concepts with regard to gathering data for the charts, filing, and there were a large amount of absences." (Exh. 4, Sanchez Depo., p. 145 ln 13-20)

35. During Kathryn Heuertz's employment at Caregivers, Inc., time was kept on the Kronos timekeeping system.  (Exh. 8, Sanchez Affidavit, ¶14)

36. Although Ms. Heuertz only ended up working eleven weeks with Caregivers, Inc., she did not make it one single week where she worked put in a full day for all of the days of the work week.  (Exh. 8, Sanchez Affidavit, ¶14)

37. According to the Kronos records, in those 11 weeks (52 working days excluding the holidays), the plaintiff missed time or failed to work a full day within 36 of those working days:

> **Week 1** - two days she failed to put in a full day
> **Week 2** - three days she failed to put in a full day
> **Week 3** - four days she failed to put in a full day
> **Week 4** - three days she failed to put in a full day – this excludes and does not count the two days for the Christmas holiday
> **Week 5** - four days she failed to put in a full day – this excludes and does not count the New Year's holiday
> **Week 6** - three days she failed to put in a full day
> **Week 7** - four days she failed to put in a full day
> **Week 8** - two days she failed to put in a full day
> **Week 9** - two days she failed to put in a full day
> **Week 10** - four days she failed to put in a full day
> **Week 11** - five days she failed to put in a full day

(Exh. 8, Sanchez Affidavit, ¶15)

38. Jean Sanchez believed that Ms. Heuertz's large amount of absences was "[v]ery unusual for someone that just started." (Exh. 4, Sanchez Depo., p. 145 ln 19-21)

39. Ms. Heuertz stated some of her work absences were related to inclement weather issues. (Exh. 7, Heuertz Depo. p. 81 ln 21-25 – p. 82 ln 1-4)

40. The inclement weather notices that were sent out by Caregivers to employees during the time that Ms. Heuertz was employed covered five total days.  (Exh. 7, Heuertz Depo., p. 84 ln 16-20)

41. In January 2019, Patty Fisher had concerns with Ms. Heuertz's attendance, including the number of call-ins or leave-earlies or come-in-lates, which were "more than the average person."  (Exh. 3, Fisher Depo., p. 128 ln 1-4)

42. Patty Fisher was also concerned with Ms. Heuertz's attendance because usually for somebody new you try to have your best attendance.  (Exh. 3, Fisher Depo., p. 128 ln 4-6)

43. Patty Fisher stated that even any excused absences can go against you in the beginning of employment because too many absences are bad for performance expectations.  (Exh. 3, Fisher Depo., p. 128 ln 13-23)

44. Ms. Heuertz's job of auditing required a lot of repetition.  (Exh. 2, Strecker Depo., p. 93 ln 14-18)

45. Heather Strecker was concerned that Ms. Heuertz was not going to become efficient at performing her job of auditing because of her absences from work. (Exh. 2, Strecker Depo., p. 93 ln 21-24)

46. All of the auditors and Patty Fisher had the same concern that Ms. Heuertz's absences were preventing her from becoming efficient at performing the chart audits.  (Exh. 2, Strecker Depo., p. 94 ln 5-16)

47. On more than one occasion, Heather Strecker offered to come in with Ms. Heuertz on a Saturday if she wanted to make up some time, however, Ms. Heuertz did not do so. (Exh. 2, Strecker Depo., p. 66 ln 21-25 – p. 67 ln 1-8; p. 79 22- 25 – p. 80 ln 1-4; & Exh. 9, Depo Exh. 133)

48. Sometime prior to January 28, 2019, Heather Strecker attended a meeting with Patty Fisher and gave Ms. Heuertz a verbal performance review and laid out some expectations.  (Exh. 2, Strecker Depo., p. 56 ln 7-15; p. 61 ln 1-16; Exh. 3, Fisher Depo., p. 124 ln 4-7)

49. Prior to this meeting with Ms. Heuertz, Patty Fisher had discussed with Heather Strecker how she thought Ms. Heuertz was performing her job and "it wasn't positive." (Exh. 2, Strecker Depo., p. 58 ln 1-7)

50. Prior to this meeting with Ms. Heuertz, Heather Strecker let Patty Fisher know the number of Ms. Heuertz's absences.  (Exh. 3, Fisher Depo., p. 125 ln 1-6)

51. Prior to this meeting with Ms. Heuertz, Patty Fisher addressed specific concerns with Heather Strecker regarding Ms. Heuertz's performance which included her attendance, her personal phone use, not focusing on the job, not completing tasks, and her not progressing as fast as one would hope.  (Exh. 3, Fisher Depo., p. 125 ln 18-25 – p. 126 ln 1-2)

52. Heather Strecker believed that Ms. Heuertz was not an effective auditor because "she just wasn't getting it and with her attendance issues when she was there it wasn't enough to be able to understand the system and get it . . . you need a lot of repetition with auditing." (Exh. 2, Strecker Depo., p. 76 ln 14-21)

53. Patty Fisher had concerns that Ms. Heuertz wasn't a good fit for Caregivers because she was unable to quickly pick the job tasks up and she wasn't processing the charts as quickly as other people in the past had done.  (Exh. 3, Fisher Depo., p. 117 ln 2-11)

54. Heather Strecker believed that Ms. Heuertz's absences were problematic and she doubted Ms. Heuertz could correct her poor attendance issues because she had not utilized any of Heather Strecker's offers for her to make up hours. (Exh. 2, Strecker Depo., p. 79 ln 5-24)

55. On January 28, 2019, Jean Sanchez emailed Patty Fisher and Heather Strecker asking Patty to update her on Ms. Heuertz's "status and her progress toward the goals [Patty] and Heather outlined for her." (Exh. 10, Depo. Exh. 56)

56. On January 29, 2019, Patty Fisher emailed Jean Sanchez and stated "I have nothing new on [Ms. Heuertz].  Still plan on a follow up with her and you in a couple weeks unless major change." (Exh. 4, Sanchez Depo., p.89 ln 18-23; Exh. 11, Depo. Exh. 55)

57. On January 29, 2019, Jean Sanchez responds by email to Patty Fisher and Heather Strecker informing them that she would like to meet on February 4, 2019, to discuss Ms. Heuertz's status. (Exh. 4, Sanchez Depo., p.90 ln 7-14; Exh. 11, Depo. Exh. 55)

58. The focus of the meeting, on or about February 4, 2019, between Jean Sanchez, Patty Fisher, and Heather Strecker was Ms. Heuertz's job performance.  (Exh. 4, Sanchez Depo., p.93 ln 13-17)

59. Jean Sanchez was most concerned with Ms. Heuertz's lack of catching on to her job functions and her inability to complete very basic tasks for that job. (Exh. 4, Sanchez Depo., p.92 ln 7-18)

60. To demonstrate the inefficiency of Ms. Heuertz's task performance, Patty Fisher stated that at the time Ms. Heuertz was terminated, she could not have audited a whole chart on her own.  (Exh. 3, Fisher Depo., p. 74 ln 1-11)

**Caregivers, Inc.'s knowledge of Heuertz's pregnancy**

61. The first written communication from Ms. Heuertz to Jean Sanchez indicating that Ms. Heuertz was pregnant was within an email on February 12, 2019.  (Exh. 7, Heuertz Depo., p. 95 ln 20-25 – p. 96 ln 1-5; Exh. 12, Depo. Exh. 62)

62. Ms. Heuertz verbally advised Heather Strecker that she was pregnant either February 7, 2019, or February 8, 2019.  (Exh. 7, Heuertz Depo., p. 147 ln 1-15)

63. During Kathryn Heuertz's employment with Caregivers, Inc., Kathryn Heuertz never made any statements that she believed that she, or any other employee, experienced pregnancy discrimination, or any other kind of discrimination, by Caregivers, Inc. (Exh. 8, Sanchez Affidavit, ¶13)

**Facts related to Heuertz's employment termination**

64. Jean Sanchez ultimately made the decision to terminate Ms. Heuertz's employment.  (Exh. 4, Sanchez Depo., p. 146 ln 23-25)

65. Jean Sanchez based her decision to terminate Ms. Heuertz's employment on the information she received from Patty Fisher and Heather Strecker that Ms. Heuertz was not able to conduct the basic functions of the job. (Exh. 4, Sanchez Depo., p. 149 ln 12-21 & p. 151 ln 11-14)

66. Sometime during the week of February 11, 2019, Jean Sanchez made the decision to terminate Ms. Heuertz's employment.  (Exh. 4, Sanchez Depo., p. 110 ln 8-11)

67. Jean Sanchez wanted to terminate Ms. Heuertz's employment during the week of February 11, 2019, but Ms. Heuertz had several absences which did not allow for a termination meeting to occur that week.  (Exh. 4, Sanchez Depo., p. 111 ln 2-14)

68. The reasons provided on Ms. Heuertz's termination form were that she was not meeting basic employment expectations and has had excessive absences.   (Exh. 13, Depo Exh. 4; Exh. 4, Sanchez Depo., p. 118 ln 15-25)

69. Ms. Heuertz's employment was terminated on February 18, 2019. (PTO Stip. Fact 19, Doc 108)

70. Ms. Heuertz was terminated in a meeting attended by Jean Sanchez and Patty Fisher. (PTO Stip. Fact 20, Doc 108)

71. At the time of Ms. Heuertz's termination, she was presented the Employee Disciplinary Action Record by Jean Sanchez and Patty Fisher. (PTO Stip. Fact 21, Doc 108)

72. The date of January 18, 2019, on the Employee Disciplinary Action Record was a typo and should have been February 18, 2019. (PTO Stip. Fact 22, Doc 108)

73. The stated reason for the termination on the Employee Disciplinary Action Record was "Individual is not meeting basic employment expectations and has had excessive absences. Per Employee Code of Conduct, individual demonstrates inefficiency in performance of assigned duties" (PTO Stip. Fact 23, Doc 108)

74. Ms. Heuertz, Jean Sanchez and Patty Fisher signed the Employee Disciplinary Action Record on February 18, 2019. (PTO Stip. Fact 24, Doc 108)

75. On the date of Ms. Heuertz's termination (February 18, 2019), Ms. Heuertz was pregnant. (PTO Stip. Fact 25, Doc 108)

76. Ms. Heuertz's pregnancy did not impact Jean Sanchez's decision to terminate her employment in any way.  (Exh. 4, Sanchez Depo., p. 145 ln 22-24 & p. 146 ln 4)

77. Heather Strecker was not surprised when she learned that Ms. Heuertz's employment was terminated because she had poor attendance and was not doing an effective job.  (Exh. 2, Strecker Depo., p. 77 ln 15-20)

**Facts related to other Caregivers, Inc. employees**

78. Kimberly Stiger, a non-pregnant female employee, was terminated for excessive absences at Caregivers, Inc.  (Exh. 14, Depo Exhibit 73, p 1-4.)

79. Prior to Ms. Stiger's termination, she was first provided a written warning regarding her excessive absences, then placed on probation for her second warning.  (Exh. 14, Depo Exhibit 73, p 1-4.)

80. Kimberly Stiger was employed with Caregivers, Inc. for almost 3 years.  (Exh. 14, Depo Exhibit 73, p 1.)

81. Kimberly Stiger's first written warning for excessive absences occurred after she was employed for nearly two years with Caregivers, Inc.  (Exh. 14, Depo Exhibit 73, p 1-2.)

82. The written warnings for Kimberly Stiger employee discipline were for excessive absences only and did not note job performance issues.  (Exh. 14, Depo Exhibit 73, p 2-4.)

83. The reasons provided on Kimberly Stiger's termination form was absenteeism/tardies. (Exh. 14, Depo Exh. 73, p. 1)

84. Heather Strecker did not have an expectation that the concern over Heuertz's absences would be put in writing like Ms. Stiger's were because Heuertz hadn't been employed very long with Caregivers.  (Exh. 2, Strecker Depo., p. 94 ln 17-25)

85. There have been other pregnant employees at Caregivers and Jean Sanchez did not terminate their employments.  (Exh. 4, Sanchez Depo. p. 146 ln 5-12)

86. Ms. Heuertz is not aware of any other female employees who were pregnant at the time their employments were terminated by Caregivers, Inc.  (Exh. 7, Heuertz Depo., p. 63 ln 12-17)

87. After Ms. Heuertz's termination, Irasema Swope was hired to replace her in that position. (Exh. 4, Sanchez Depo., p. 130 ln 6-8)

88. Patty Fisher was also the supervisor for Irasema Swope. (Exh. 3, Fisher Depo. p.173 18-22)

89. Patty Fisher had no problems or concerns with Ms. Swope's work performance.  (Exh. 3, Fisher Depo. p.174 14-16)

90. Irasema Swope was pregnant within the first three months of her starting her employment with Caregivers, Inc. and her employment was not terminated by Caregivers, Inc.  (Exh. 4, Sanchez Depo., p. 156 ln 12-19)

### Facts Related to the Caregivers Entities and Heuertz's Employment

91. Patty Fisher was an employee of Caregivers, Inc.  (Exh. 1, Schulte Depo. p. 78 ln. 12-15)

92. Heather Strecker is an employee of Caregivers, Inc. (Exh. 1, Schulte Depo. p. 101 ln. 2-5)

93. Ed Schulte has been the President and CEO of Caregivers, Inc., since it was formed in 2004 to the present. (PTO Stip. Fact 4, Doc 108)

94. Throughout Ms. Heuertz's employment, the President and CEO of Caregivers, Inc., was Ed Schulte. (PTO Stip. Fact 5, Doc 108)

95. Ed Schulte has been the President and CEO of Caregivers Home Health, LLC since at least 2018.  (PTO Stip. Fact 6, Doc 108)

96. Throughout Ms. Heuertz's employment, the President and CEO of Caregivers Home Health LLC was Ed Schulte. (PTO Stip. Fact 7, Doc 108)

97. Ed Schulte has been the President and CEO of Caregivers of Kansas, LLC since at least 2018.  (PTO Stip. Fact 8, Doc 108)

98. Throughout Ms. Heuertz's employment, the President and CEO of Caregivers of Kansas LLC was Ed Schulte. (PTO Stip. Fact 9, Doc 108)

99. Throughout Ms. Heuertz's employment, Ed Schulte was an owner of Caregivers Holding Company. (PTO Stip. Fact 10, Doc 108)

100. Jean Sanchez was hired by Caregivers, Inc, Caregivers Home Health LLC and Caregivers of Kansas as the Director of Operations on May 1, 2018. (PTO Stip. Fact 11, Doc 108)

101. Throughout Ms. Heuertz's employment, the Director of Operations of Caregivers, Inc., Caregivers Home Health LLC and Caregivers of Kansas was Jean Sanchez. (PTO Stip. Fact 12, Doc 108)

102. Defendant Caregivers Holding Company, Inc. is a Kansas corporation registered to do business in, and operating in, the State of Kansas. (PTO Stip. Fact 27, Doc 108)

103. Defendant Caregivers of Kansas, Inc. is a Kansas corporation registered to do business in, and operating in, the State of Kansas. (PTO Stip. Fact 28, Doc 108)

104. Defendant Caregivers, Inc. is a Kansas corporation registered to do business in, and operating in, the State of Kansas. (PTO Stip. Fact 29, Doc 108)

105. Caregivers Home Health, LLC's principal place of business is in Centerville, Iowa. (Exh. 15, Schulte Corp. Rep. Depo., p. 34 ln 22-25)

106. The Caregivers entities contract with Midwest Health to produce payroll checks to employees. (Exh. 17, Sanchez Corp. Rep. Depo., p. 25 ln 22-25 – p. 26 ln 1-2)

107. Caregivers Holding Company owns a hundred percent of Caregivers Home Health, LLC, Caregivers of Kansas, Inc., and Caregivers, Inc. (Exh. 15, Schulte Corp. Rep. Depo., p. 13 ln 5-10)

108.  Caregivers Home Health, LLC, Caregivers of Kansas, Inc., and Caregivers, Inc. are all separate companies under one holding company.  (Exh. 15, Schulte Corp. Rep. Depo., p. 13 ln 20-24)

109.  The owners of Caregivers Holding Company are James Klausman, Floyd Eaton, Jr. and Ed Schulte.  (Exh. 15, Schulte Corp. Rep. Depo., p. 15 ln 2-6)

110.  Kathryn Heuertz was hired as an employee of Caregivers, Inc. (Exh. 8, Sanchez Affidavit, ¶3)

111.  The 2018 and 2019 W-2 forms list Caregivers, Inc. as Ms. Heuertz's employer.  (Exh. 16, Depo. Exh. 14 & 15)

112.  Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc., have never been an employer in any capacity of Kathryn Heuertz. (Exh. 8, Sanchez Affidavit, ¶4)

113.  Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc., have no ability to (i) terminate; (ii) discipline; (iii) supervise on a daily basis; (iv) train; (v) evaluate; (vi) set compensation and hours; or (vii) control employee records of Kathryn Heuertz. (Exh. 8, Sanchez Affidavit, ¶5)

114.  Only Caregivers, Inc. had the ability to terminate Kathryn Heuertz's employment.  (Exh. 8, Sanchez Affidavit, ¶6)

115.  Only Caregivers, Inc. had the ability to issue discipline regarding Kathryn Heuertz's employment. (Exh. 8, Sanchez Affidavit, ¶7).

116.  Only Caregivers, Inc., through myself and Patty Fisher, supervised Kathryn Heuertz's employment on a daily basis.  (Exh. 8, Sanchez Affidavit, ¶8).

117.   Only Caregivers, Inc., through Patty Fisher and Heather Strecker, trained Kathryn Heuertz for her employment duties.  (Exh. 8, Sanchez Affidavit, ¶9).

118.   Only Caregivers, Inc. had the ability to evaluate Kathryn Heuertz's employment performance.  (Exh. 8, Sanchez Affidavit, ¶10).

119.   Only Caregivers, Inc. had the ability to set the compensation and hours for Kathryn Heuertz's employment. (Exh. 8, Sanchez Affidavit, ¶11)

120.   Only Caregivers, Inc. controlled Kathryn Heuertz's employment records.  (Exh. 8, Sanchez Affidavit, ¶12)

## ARGUMENT AND AUTHORITIES

### *Standard of Review*

Summary judgment is only appropriate when the "depositions, documents, . . . affidavits or declarations, . . . admissions, interrogatory answers, or other materials" shows that there is "no genuine dispute as a to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  The moving party must carry its burden by establishing no genuine issues remain for trial.  *Celotex v. Catrett,* 477 U.S. 317, 323 (1986).   But summary judgment remains inappropriate if the non-moving party demonstrates that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 586-87 (1986).  And, in making its determination, the court must draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986).

I.      **Heuertz's Claims Against Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. All Fail Because the Entities were not Heuertz's Employer**

Heuertz was at all relevant times only employed by Caregivers, Inc., not Defendants Caregivers Home Health, LLC, Caregivers Holding Company, or Caregivers of Kansas, Inc.  <u>Only</u> Caregivers, Inc., and its employees, made <u>all</u> decisions affecting Heuertz's employment. Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. made no decisions affecting any aspect of Heuertz's employment and had no ability to (i) terminate; (ii) discipline; (iii) supervise on a daily basis; (iv) train; (v) evaluate; (vi) set compensation and hours; or (vii) control Heuertz's employee records.  Therefore, Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. are neither a joint nor single employer of Heuertz under Title VII or Kansas Law.

An employee can usually only bring employment claims against his or her direct employer. *See Zinn v. McKune*, 143 F.3d 1353, 1361 (10th Cir. 1998); *JP Morgan Chase Bank, N.A. v. Wells Fargo Bank, N.A.,* 2017 WL 1758066 (N.D. Okla. May 4, 2017) (being corporate affiliates does "not get [the plaintiff] very far").  Caregivers, Inc., not Caregivers Home Health, LLC, Caregivers Holding Company, or Caregivers of Kansas, Inc., was Heuertz's employer.

The Tenth Circuit, however, has recognized two exceptions to that general rule: first, when two entities exercise control over essential terms and conditions of the employment (joint-employers); and second, when two entities act essentially as one employer (single-employer).[1]  *See Bristol v. Board of County Commr's of the County of Clear Creek,* 312 F.3d 1213, 1218 (10th Cir. 2002); *Frank v. U.S West, Inc.,* 3 F.3d 1357, 1362 (10th Cir. 1993).  But neither exception applies

---

[1] Another test, the hybrid test, is only used for independent contractors.  *See Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1226 (10th Cir. 2014).

to the relationship between Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. and Heuertz. Each test is explained in turn.

To start, joint employers are entities that "share or co-determine those matters governing the essential terms and conditions of employment." *Sandoval v. Boulder Regional Communications*, 388 F.3d 1312, 1323-24 (10th Cir. 2004). In other words, an entity is not a joint employer unless it "exercise[s] significant control" over the employee. *Id.* And, to make that determination, the court should consider an entity's ability to: (i) terminate; (ii) discipline; (iii) supervise on a daily basis; (iv) train; (v) evaluate; (vi) set compensation, benefits, and hours; and (vii) control employee records. *Knitter v. Corvias Military Living, LLC,* 758 F.3d 1214, 1226 (10th Cir. 2014) (citing *Butterbaugh v. Chertoff,* 479 F.Supp.2d 485, 491 (W.D.Pa.2007)). Chief among those factors, though, is the entity's power to terminate an employee. *Sandoval*, 388 F.3d at 1323-24; *Knitter*, 758 F.3d at 1226 (holding that the termination factor weighs most heavily).

But none of the entities, Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. controlled the conditions of Heuertz's employment or, most importantly, have the power to terminate Heuertz's employment. Like the alleged joint employer in *Knitter*, these entities: (i) could not terminate her; (ii) did not pay her directly; and (iii) had no ability to supervise or discipline her. *Knitter*, 758 F.3d at 1226. So too, like the alleged employer in *Knitter*, none of these entitles were a joint employer. *Id.* Applying a similar analysis to similar businesses, courts have <u>not</u> found health and rehabilitation affiliates to be joint employers. *See Nethery v. Quality Care Investors, L.P.*, 382 F. Supp. 3d 776, 780 (M.D. Tenn. 2019); *Hiralall v. SentosaCare, LLC,* 2016 WL 1126530, at *10 (S.D.N.Y. Mar. 18, 2016); *cf Odhuno v. Reed's Cove Health & Rehab., LLC,* 2020 WL 1151325 (slip copy), at *16-17 (holding the defendant was a joint employer when the defendant's: (i) leadership was often involved in employee suspensions

18

and terminations; (ii) employees terminated the employment; (iii) leadership promised to assist the plaintiff; (iv) and employees assisted in all aspects of human resources administration).

Nor are any of these entities Heuertz's employer under the single employer exception. Similar to the joint employer test, an entity's "right to terminate employment is the most important" factor. *Sandoval*, 388 F.3d at 1323-24. And these entities had no ability to terminate Heuertz's employment. What is more, none of the other single employer factors—interrelation of operations, common management, or common ownership and financial control—compel a different conclusion. *Sandoval*, 388 F.3d at 1322 (10th Cir. 2004) (citing *Bristol*, 312 F.3d at 1220). That is, Caregivers, Inc. and Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. do not have: (i) shared office space and equipment or (ii) common non-executive employees. Therefore, nothing can justify treating Caregivers Home Health, LLC, Caregivers Holding Company, or Caregivers of Kansas, Inc. as a single employer with Caregivers, Inc.

Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. did not exercise control over Heuertz's employment to be liable under joint employer theory of liability. Furthermore, Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. are not synonymous entities with Caregivers, Inc. As a result, these entities and Caregivers, Inc. cannot be treated as the same entity for liability. Therefore, these entities were not Heuertz's employer and cannot be liable to her for the employment actions of Caregivers, Inc.; summary judgment is warranted in favor of Defendants Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. on all claims.

## II.       ALL OF HEUERTZ'S CLAIMS ALSO FAIL ON THE MERITS

Regardless of which entity is deemed Heuertz's employer, Heuertz was terminated for a legitimate and non-discriminatory reason—namely, that she failed to effectively perform her job duties and had excessive absences that amounted to failing to work a full day in 36 of the 52 working days that she was employed with Caregivers, Inc.  Therefore, Heuertz is unable to meet her burden to prove any of the claims she has asserted: (1) Discrimination in violation of Title VII and the Pregnancy Discrimination Act); (2) Retaliation in violation of Title VII and the Pregnancy Discrimination Act; (3) Fraud by Silence; (4) Fraudulent Misrepresentation; (5) Negligent Misrepresentation; and (6) Negligent Non-Disclosure.

### 1.  HEUERTZ CANNOT PROVE HER CLAIM OF DISCRIMINATION IN VIOLATION OF TITLE VII AND THE PREGNANCY DISCRIMINATION ACT

Title VII prohibits employers from terminating an employee "'because of the employee's sex and, more specifically, because the employee is pregnant.'" *Battino v. Redi-Carpet Sales of Utah, LLC*, No. 20-4081, 2021 U.S. App. LEXIS 27403, at *4 (10th Cir. Sep. 13, 2021) (quoting *Fassbender v. Correct Care Sols., LLC*, 890 F.3d 875, 882 (10th Cir. 2018).  Caregivers, Inc. does not dispute that Heuertz was pregnant at the time her employment was terminated.  Therefore, Heuertz must prove that her employment termination was the result of discrimination either through direct evidence or through circumstantial evidence warranting review under the *McDonnell Douglas* burden-shifting analysis. *See Fassbender,* 890 F.3d at 882-84.  Under the *McDonnell Douglas* framework, the employer must articulate a legitimate, nondiscriminatory reason for the employment termination and once the employer identifies a legitimate reason for its action, the burden shifts back to the employee to prove that the proffered legitimate reason was a

pretext for discrimination.  *Battino,* at *6 (citing *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1114-15 (10th Cir. 2007).

### A.      Heuertz Fails to Provide any Evidence Caregivers, Inc. Discriminates Against Pregnant Employees.

Under the *McDonnell Douglas* framework, Heuertz must first establish a prima facie case of gender discrimination.  "A prima facie case generally requires a plaintiff to show, by a preponderance of the evidence, that she is a member of a protected class, she suffered an adverse employment action, and the challenged action occurred under circumstances giving rise to an inference of discrimination." *Bennett v. Windstream Communs., Inc.*, 792 F.3d 1261, 1266 (10th Cir. 2015) (citing *E.E.O.C. v. PVNF, L.L.C.*, 487 F.3d 790, 800 (10th Cir. 2007)).  Defendants do not dispute that Heuertz is a member of a protected class and her employment termination was an adverse employment action.  The only circumstance that could give rise to an inference of discrimination is that Heuertz was pregnant at the time of her termination.  Because of this circumstance, Heuertz can arguably reach the low burden of establishing a prima facie case of gender discrimination.

Therefore, continuing under the *McDonnell Douglas* framework, "the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action."  *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1259 (10th Cir. 2001). After Caregivers, Inc. advances a legitimate non-discriminatory reason, then the burden shifts back to Heuertz to prove the reason "is merely a pretext for unlawful discrimination." *Id.*

Caregivers, Inc. is only required to explain the decision to terminate Heuertz's employment in terms that are not facially prohibited by Title VII.  *See E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1317 (10th Cir. 1992). This burden is "one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000);

*E.E.O.C. v. C.R. England*, 644 F.3d 1028, 1043 (10th Cir. 2011) (describing the employer's burden as "exceedingly light."). Caregivers, Inc. has met its burden by proffering evidence that Heuertz did not meet basic employment expectations and had excessive absences.

> **B.** **Caregivers, Inc. Has Articulated a Legitimate Non-Discriminatory Reason for Heuertz's Termination.**

Heuertz's employment was terminated because she failed to effectively perform her job duties and had excessive absences that amounted to failing to work a full day in 36 of the 52 working days she was employed. Heuertz must show that these non-discriminatory reasons for her termination was pretext. At the pretext stage, Heuertz must demonstrate "the defendant discriminated on the illegal basis." *Swackhammer v. Sprint/United Mgmt., Co.*, 493 F.3d 1160, 1167 (10th Cir. 2007) (internal citations and quotations omitted). Heuertz carries the burden of showing that: (i) "a discriminatory reason more likely motivated the [decision by Caregivers, Inc.];" or (ii) "that [Caregivers, Inc.'s] proffered legitimate reason is unworthy of credence." *Banks v. the Armed Forces Bank*, 313 F. Supp. 2d 1095 (D. Kan. 2004). Even weaknesses, inconsistencies, and contradiction will not demonstrate pretext unless they are significant enough that a reasonable factfinder could determine that the employer did not act for the asserted non-discriminatory reason. *See Burney v. Cnty. Comm'rs of the Cnty of Shawnee, Kan.*, 413 F.Supp.2d 1195, 1201 (D. Kan. 2006). Similarly, the Court should not second guess whether Caregivers, Inc.'s reasons "were wise, fair, or correct." *Young v. Dillon Cos., Inc.*, 468 F.3d 1243, 1250 (10th Cir. 2006); *see also Adamson v. Multi Community*, 514 F.3d 1136, 1153 (10th Cir. 2008).

Instead, Heuertz must provide evidence that: (1) Caregivers, Inc. stated a false reason for her termination; (2) her termination was contrary to a written company policy; or (3) her termination was contrary to an unwritten policy, which requires evidence of different treatment of

similarly situated employees.  *Burney*, 413 F.Supp.2d at 1201.  Mere conjecture will not do.
*Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997).

### 1.  Caregivers, Inc.'s stated reason for Heuertz's termination was not false.

There are no facts in this case that tend to show that Caregivers, Inc. did not honestly believe that Heuertz failed to effectively perform her job duties and had excessive absences that amounted to failing to work a full day in 36 of the 52 working days she was employed:

> **Week 1** - two days she failed to put in a full day
> **Week 2** - three days she failed to put in a full day
> **Week 3** - four days she failed to put in a full day
> **Week 4** - three days she failed to put in a full day – this excludes and does not count the two days for the Christmas holiday
> **Week 5** - four days she failed to put in a full day – this excludes and does not count the New Year's holiday
> **Week 6** - three days she failed to put in a full day
> **Week 7** - four days she failed to put in a full day
> **Week 8** - two days she failed to put in a full day
> **Week 9** - two days she failed to put in a full day
> **Week 10** - four days she failed to put in a full day
> **Week 11** - five days she failed to put in a full day

Jean Sanchez believed that Heuertz's large amount of absences was "[v]ery unusual for someone that just started."  In January 2019, Patty Fisher had concerns with Heuertz's attendance, including the number of call-ins or leave-earlies or come-in-lates, which were "more than the average person."  Patty Fisher was also concerned with Heuertz's attendance because usually for somebody new you try to have your best attendance.  Patty Fisher stated that even any excused absences can go against you in the beginning of employment because too many absences are bad for performance expectations.  Heuertz's job of auditing required a lot of repetition.  Heather Strecker was concerned that Heuertz was not going to become efficient at performing her job of auditing because of her absences from work.  All of the auditors and Patty Fisher had the same concern that Heuertz's absences were preventing her from becoming efficient at performing the

chart audits.  On more than one occasion, Heather Strecker offered to come in with Heuertz on a Saturday if she wanted to make up some time, however, Heuertz did not do so. Heather Strecker believed that Heuertz's absences were problematic and she doubted Heuertz could correct her poor attendance issues because she had not utilized any of her offers for her to make up hours.  All these concerns were prior to Heuertz's own knowledge that she was pregnant.

Sometime before January 28, 2019, prior to Heuertz's knowledge that she was pregnant, Heather Strecker attended a meeting with Patty Fisher and gave Heuertz a verbal performance review and laid out some expectations.  Prior to this meeting with Heuertz, Patty Fisher had discussed with Heather Strecker how she thought Heuertz was performing her job and "it wasn't positive."  Prior to this meeting with Heuertz, Heather Strecker let Patty Fisher know the number of Heuertz's absences.  Prior to this meeting with Heuertz, Patty Fisher addressed specific concerns with Heather Strecker regarding Heuertz's performance which included her attendance, her personal phone use, not focusing on the job, not completing tasks, and her not progressing as fast as one would hope.

On January 28, 2019, Jean Sanchez emailed Patty Fisher and Heather Strecker asking Patty to update her on Heuertz's "status and her progress toward the goals [Patty] and Heather outlined for her." On January 29, 2019, Jean Sanchez informed Patty Fisher and Heather Strecker by an email to them that she would like to meet on February 4, 2019, to discuss Heuertz's status.  The focus of the meeting, on or about February 4, 2019, between Jean Sanchez, Patty Fisher, and Heather Strecker was Heuertz's job performance.  Jean Sanchez was most concerned with Heuertz's lack of catching on to her job functions and her inability to complete very basic tasks for that job.  All these events took place prior to Caregivers, Inc. having any knowledge of Heuertz's pregnancy.  Heuertz has no evidence to show that Caregivers, Inc. did not honestly

believe that Heuertz failed to effectively perform her job duties and had excessive absences.

### 2. Heuertz's termination was not contrary to a written company policy.

Like all Caregivers, Inc's employees, Heuertz received Caregivers, Inc.'s Employee Handbook.  The Caregivers Employee Handbook lists "excessive absences or lateness" as an example of an offense that an employee can be disciplined for and that unnecessary absenteeism and lateness are expensive and place an unfair burden on other employees. The Caregivers Employee Handbook also states that possible disciplinary actions include "counseling, formal warnings, suspension and discharge" and that "the specific action to be taken will depend on the nature of the offense, the circumstances and your previous record."  Heuertz knew that she could be terminated for excessive absences or lateness.  Nonetheless, Heuertz failed to work a full day in 36 of the 52 working days she was employed.  Caregivers, Inc.'s Employee Handbook made it clear that excessive absences or lateness is an offense that an employee can be terminated for. Heuertz cannot identify any Caregiver's, Inc.'s policy that her termination contradicted.

### 3. Heuertz has no evidence of different treatment of similarly situated employees.

Heuertz has attempted to compare her termination to Kimberly Stiger's, a non-pregnant female employee who was terminated for excessive absences at Caregivers, Inc. before Heuertz was employed there.  The main difference that Heuertz points to in her comparison with Ms. Stiger is that prior to Ms. Stiger's termination, she was first provided a written warning regarding her excessive absences, then placed on probation for her second warning.  There are several issues that make Ms. Stiger's discipline and termination incomparable to Heuertz's events.

Ms. Stiger was employed with Caregivers, Inc. for almost three years. Ms. Stiger's first written warning for excessive absences occurred after she was employed for nearly two years with Caregivers, Inc.  The written warnings for Ms. Stiger's employee discipline were for excessive

absences only and did not note job performance issues. The reasons provided on Ms. Stiger's termination form was absenteeism/tardies. She was not terminated or disciplined for the additional reason of failing to effectively perform her job duties. Essentially, Heuertz is attempting to compare herself, a newly hired employee in the first weeks of her employment, with another female employee who was employed with Caregivers for years before a written warning was issued to her.

Caregivers does not have a formal policy to require progressive discipline of employees; supervisors can take situations on a case-by-case basis. Heather Strecker did not have an expectation that the concern over Heuertz's attendance and work performance would be put in writing like Ms. Stiger's were because Heuertz hadn't been employed very long with Caregivers and Strecker would not have expected a need for formal written discipline. Newly hired employees at Caregivers, Inc. are treated differently in the first 90 days of their employment.

An employee hired at Caregivers, Inc. is not even allowed to take PTO leave until after the employee has completed the first 90 days of employment. Jean Sanchez looks at an employee's performance for the first 90 days of their employment to determine whether they will be able to perform the job. Jean Sanchez's assessment of Heuertz's job performance was that "she did not appear to be grasping some of the basic concepts with regard to gathering data for the charts, filing, and there were a large amount of absences." Since Heuertz was within the first 90 days of her employment with Caregivers, Inc., she cannot properly compare the lack of an implementation of written or progressive discipline with an employee who was there three years. Therefore, Heuertz cannot present evidence of different treatment of a similarly situated employee to support an argument of pretext.

Even more detrimental to Heuertz's inability to identify a similarly situated employee that

was treated more favorably is the evidence that Caregivers, Inc. does not terminate female employees because they are pregnant. While Heuertz stated that she is not aware of any other female employees who were pregnant at the time their employments were terminated by Caregivers, Inc., there have been other pregnant employees at Caregivers, prior to Heuertz's employment, and Jean Sanchez did not terminate their employments. Additionally, after Heuertz's termination, Irasema Swope was hired to replace her in that position. Patty Fisher was also the supervisor for Ms. Swope. Patty Fisher had no problems or concerns with Ms. Swope's work performance. Ms. Swope became pregnant within the first three months of her starting her employment with Caregivers, Inc. and her employment was not terminated.

### C. Heuertz Cannot Prove a Title VII Claim for her Termination.

Finally, Caregivers, Inc.'s rationale for terminating Heuertz has remained consistent. *See Conroy v. Vilsack,* 707 F.3d 1163, 1174 (10th Cir. 2013) (noting that "t]he focus is on the employer's justification for its decision – for example, did the employer offer inconsistent reasons for its decision, or is the employer's explanation so implausible that a jury could find it unworthy of credence"). Heuertz's termination was based upon her inability to perform her job duties and her excessive absences. All of which were clear issues entirely unrelated to Heuertz's pregnancy, as they were identified and addressed even prior to Heuertz's own knowledge of her pregnancy.

Heuertz was pregnant at the time of her termination (a pregnancy that she first learned of just days before she was terminated). However, her pregnancy was not relevant and did not play any part of the decision to let her go. Heuertz's termination was simply a result of her work or lack thereof. Furthermore, there have been multiple employees of Caregivers, Inc. who have been or became pregnant during their employment at Caregivers that were not terminated. However, those other employees had neither the absences nor the performance issues that Heuertz had. In

short, Heuertz pregnancy played no role in the decision to terminate her, and Jean Sanchez would have terminated her employment regardless of that status.

Therefore, Heuertz has no proof of any actions that would constitute pregnancy discrimination under Title VII. She cannot demonstrate that she was terminated for a discriminatory reason or that her employer's reason for termination was not legitimate. The Defendants are entitled to summary judgment on this claim.

## 2. HEUERTZ CANNOT PROVE A PRIMA FACIE CASE FOR HER CLAIM OF RETALIATION IN VIOLATION OF TITLE VII AND THE PREGNANCY DISCRIMINATION ACT

"To state a prima facie case for retaliation under Title VII, a plaintiff must show '(1) that [s]he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1193 (10th Cir. 2012) (quoting *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 998 (10th Cir. 2011). Once the plaintiff has stated her prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id*. at 1192. If the defendant is successful, a plaintiff must show either that her protected status was a "determinative factor" in the defendant's employment decision or that the defendant's explanation is pretext. *Id*.

### 1.    Heuertz Did Not Engage in a Protected Activity

In this case, it is impossible for Heuertz to demonstrate that she engaged in *any* protected opposition to discrimination of any kind. It is undisputed that Heuertz did not indicate to her employers, or even co-workers, that she believed that Caregivers, Inc. was engaged in any type of

discriminatory actions for any employee.  Heuertz has alleged in this action that her termination

was due to pregnancy discrimination; however, Heuertz took no protected actions while employed

to oppose any such discrimination.  Therefore, her retaliation claim fails at the first element.

### 2.       Heuertz Cannot Show a Causal Connection Between Any Protected Activity and Her Termination.

Even if Heuertz could come forward with any fact to demonstrate she engaged in a

protected activity, she must also demonstrate her alleged complaint of discrimination was the but-

for cause of her termination.  *Aman v. Dillon Cos., Inc.,* 645 Fed. Appx. 719, 727 n.5 (10th Cir.

2016).   Heuertz cannot do so because Caregivers, Inc. has articulated a legitimate

nondiscriminatory reason for her termination.  *See* argument above at II(1)(B).  For all these same

reasons, Heuertz cannot prove a prima facie case for her claim of retaliation under Title VII.

Heuertz's retaliation claim fails as a matter of law and the Defendants are entitled to summary

judgment.

### 3.       HEUERTZ CANNOT PROVE A PRIMA FACIE CASE FOR FRAUD BY SILENCE

To establish a claim of fraud by silence, Heuertz must prove (1) Caregivers, Inc. possessed

knowledge of material facts "the plaintiff could not have discovered by the exercise of reasonable

diligence"; (2) Caregivers, Inc. was obligated to communicate these material facts to Heuertz, yet

Caregivers intentionally failed to do so; (3) Heuertz justifiably relied upon Caregivers, Inc. to

communicate the material facts to her; and (4) The failure to communicate resulted in Heuertz's

damages. *Thomas v. Air Midwest, Inc*., 1994 Kan. App. Unpub. LEXIS 959, at *9 (Ct. App. Apr.

15, 1994) (citing PIK Civ. 2d 14.42).  The obligation can be a legal or equitable obligation.  *See*

*DuShane v. Union Nat'l Bank*, 223 Kan. 755 (1978).  It is undisputed that Heuertz was an at-will

employee with Caregivers, Inc.  Absent some exception to the employment-at-will doctrine, there

is no obligation for the employer to communicate an impending cause for termination to an employee. *Barker v. Kan. Dep't of Labor*, 372 P.3d 446 (Kan. Ct. App. 2016); *see also Allsup v. Mount Carmel Med. Ctr.*, 22 Kan. App. 2d 613, 617 (1996) (discussing that an "implied agreement to the contrary" may create a for-cause termination). Therefore, at-will employment typically allows an employer to terminate an employee for "good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." *Allsup v. Mount Carmel Med. Ctr.*, 22 Kan. App. 2d 613, 617 (1996).

Heuertz was an at-will employee.  There was no exception present to the at-will employment occurring between the parties which would have required Caregivers, Inc. to take additional steps or procedures before termination.  Simply put, the only contractual agreement that existed between the parties is that Heuertz agreed to perform services in exchange for Caregivers, Inc.'s compensation. *Barker v. Kan. Dep't of Labor*, 372 P.3d 446 (Kan. Ct. App. 2016) (stating "either party may end the relationship at any time for any reason or no reason without penalty or future obligation").

Nor did Caregivers, Inc. keep material knowledge from Heuertz.  Heuertz agreed to carry out the services she was hired to perform.  These services included providing full days of work each work week.  Yet, Heuertz failed to work a full day for 36 days of the 52 working days she was employed by Caregivers, Inc.  As such, the Plaintiff did not fulfill her obligations to complete her expected hours.  It is implicit in an employment arrangement that the employee will be present for the hired position.  Through the Caregivers Employee Handbook, Heuertz had complete access to the material facts, such as absences and Caregivers, Inc.'s policy of such absences.  Due to the nature of employment, Caregivers was under no obligation to issue a warning about her absences

and/or failure to work full days.  Therefore, Heuertz has no legally viable claim for fraud by silence against Caregivers, Inc. in this matter and summary judgment is appropriate.

### 4.     HEUERTZ CANNOT PROVE A PRIMA FACIE CASE FOR FRAUDULENT MISREPRESENTATION

"One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation."  *Hanson v. Hackman Corp*., 192 P.3d 1130 (Kan. Ct. App. 2008) (citing the Restatement (Second) of Torts § 525).  "Fraudulent misrepresentation includes affirmative acts and misstatements of fact or the concealment of acts or facts which legally or equitably should be revealed." *Albers v. Nelson*, 248 Kan. 575, 579 (1991) (citing Citizens *State Bank v. Gilmore*, 226 Kan. at 667.)  "Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his injury and damage." *Nordstrom v. Miller,* 227 Kan. 59, 65 (1980).

"Fraud is never presumed and must be shown by a preponderance of evidence of a clear, convincing, and satisfactory nature."  *Gragg v. Rhoney*, 20 Kan. App. 2d 123, 884 P.2d 443, 446 (1994) (citing *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 78, 596 P.2d 816 (1979); *Fox v. Wilson,* 211 Kan. 563, Syl. P 2, 507 P.2d 252 (1973)).  "A representation made innocently and in good faith does not constitute fraud."  *Waxse v. Res. Life Ins. Co.*, 248 Kan. 582, 587 (1991) (citing *Nordstrom v. Miller*, 227 Kan. at 64-65; *Scott v. National Reserve Life Ins. Co.*, 143 Kan. 678, 679, 56 P.2d 76 (1936)).  "Kansas courts imply a duty of good faith and fair dealing in every contract." *St. Catherine Hosp. v. Rodriguez*, 25 Kan. App. 2d 763, 765-66 (1998) (citing

*Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 726 (1993)). However, "employment-at-will contracts are the only exception to the good faith obligation currently recognized in Kansas." *The Hartford v. Tanner*, 22 Kan. App. 2d 64, 71 (1996).

It is undisputed that Heuertz was an at-will employee with Caregivers, Inc. Absent some exception to the employment-at-will doctrine, there is no obligation for the employer to communicate an impending cause for termination to an employee. *Barker v. Kan. Dep't of Labor*, 372 P.3d 446 (Kan. Ct. App. 2016); *see also Allsup v. Mount Carmel Med. Ctr.*, 22 Kan. App. 2d 613, 617 (1996) (discussing that an "implied agreement to the contrary" may create a for-cause termination). Therefore, at-will employment typically allows an employer to terminate an employee for "good cause, for no cause, or even for a wrong cause, without incurring liability to the employee for wrongful discharge." *Allsup v. Mount Carmel Med. Ctr.*, 22 Kan. App. 2d 613, 617 (1996).

To prove this claim, Heuertz must provide evidence that Caregivers, Inc. made an "untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth" and Heuertz has failed to do so. *Nordstrom v. Miller*, 227 Kan. 59, 65 (1980). No misrepresentation was made by Caregivers to Heuertz. She was free to attend whatever appointments she found necessary; but her employer also remained free to be dissatisfied to the point of termination for her aggregated absences. Heuertz did not inquire about her absence record or how her constant inadequate hours may affect her job performance. Caregivers did not knowingly or recklessly provide any misrepresentation to Heuertz, nor did they owe a duty to warn an at-will employee she was not fulfilling her agreed-upon duties. Heuertz has no evidence to support that any untrue statement of fact, known to be untrue by the party making it, was ever stated to her and she has no evidence that any untrue statement was made with the

32

intent to deceive or recklessly made with disregard for the truth.  For these reasons, Heuertz has

no legally viable claim for fraudulent misrepresentation and summary judgment is appropriate.

### 5.   HEUERTZ CANNOT PROVE A PRIMA FACIE CASE FOR NEGLIGENT MISREPRESENTATION

"One who, in the course of his business, profession or employment, or in any other

transaction in which he has a pecuniary interest, supplies false information for the guidance of

others in their business transactions, is subject to liability for pecuniary loss caused to them by

their justifiable reliance upon the information, if he fails to exercise reasonable care or competence

in obtaining or communicating the information."  Restatement (Second) of Torts § 552 (1976)

(adopted in *Mahler v. Keenan Real Estate, Inc*., 255 Kan. 593, 604-605 (1994)).  "[T]he tort applies

only to cases of misrepresentation of factual, commercial information and not to statements of

future intent."  *Phillips v. Tyler*, 35 Kan. App. 2d 256, 259 (2006)).  The claim "requires proof that

the defendants failed to exercise reasonable care or competence to obtain or communicate true

information."  *Id.*

Notably, this tort claim "can never be premised on a claim of nondisclosure because a

failure to speak does not satisfy an essential element of the claim: affirmatively supplying false

information."  *Hanson v. Hackman Corp*., 192 P.3d 1130 (Kan. Ct. App. 2008).  To prove this

claim, Heuertz must first present evidence that Caregivers, Inc. supplied her with false information.

Even if Heuertz came forward with false information provided to her, she cannot prove the

remaining elements of this claim.

As discussed above, beyond compensation for services, Caregivers, Inc. owed no further

duties or obligations to Heuertz.  More importantly, Heuertz's at-will employment did not create

a business transaction between the parties.  Heuertz was free to request time to leave work for

appointments, and her employer was free to consider her absences against her. "Negligent misrepresentation occurs when a person who has a financial interest in a transaction gives false information to guide another person in that transaction and that other person reasonably relies upon the false information." *Classico, LLC v. United Fire & Cas. Co.*, 386 P.3d 529 (Kan. Ct. App. 2016) (citing *Stechschulte v. Jennings*, 297 Kan. 2, 22 (2013)). Caregivers, Inc. did not have a financial interest in Heuertz's workplace absences, and nothing about the relationship between the parties created a commercial transaction. Additionally, as discussed above, Caregivers did not have a duty to warn Plaintiff her troublesome work presence, or lack thereof. For these reasons, Heuertz has no legally viable claim for negligent misrepresentation and summary judgment is appropriate.

### 6.     HEUERTZ CANNOT PROVE A PRIMA FACIE CASE FOR NEGLIGENT NON-DISCLOSURE

"One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question." *Hanson v. Hackman Corp.*, 192 P.3d 1130 (Kan. Ct. App. 2008) (citing Restatement (Second) of Torts § 551 (1976)). This claim directly fails for the same reasons set forth above in Section II(3)(4)&(5).

Heuertz merely engaged in an at-will employment agreement and no good faith or fair dealing duties were imposed on Caregivers, Inc. Nor was Caregivers, Inc. under any duty or obligation to warn Heuertz of an impending termination. *Barker v. Kan. Dep't of Labor*, 372 P.3d 446 (Kan. Ct. App. 2016) (noting the <u>only</u> duty owed to an at-will employee by an employer is the

duty to compensate an employee for services rendered).  Instead, Heuertz should have done her due diligence by inquiring about the effects of her absences on her employment.  She did not do so.  For these reasons, Heuertz has no legally viable claim for negligent non-disclosure and summary judgment is appropriate.

## CONCLUSION

Only direct employers are liable for employment claims.  But Caregivers Home Health, LLC, Caregivers Holding Company, and Caregivers of Kansas, Inc. were not Heuertz's employer and cannot be liable to Heuertz for any of her claims.  Additionally, all Defendants are entitled to judgment in their favor as Heuertz has failed to prove prima facie cases for any of her claims.  Therefore, for these reasons set forth, the Defendants respectfully request that this Court grant the Defendants' motion for summary judgment.

Respectfully submitted,

SLOAN, EISENBARTH, GLASSMAN,
    MCENTIRE & JARBOE, L.L.C.
534 S. Kansas Avenue, Suite 1000
Topeka, KS    66603
Office: (785) 357-6311
Fax:     (785) 357-0152
s/ Stephen D. Lanterman
Stephen D. Lanterman, KS #18844
slanterman@sloanlawfirm.com
**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 10th day of December, 2021, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to the following parties:

>   Virginia Stevens Crimmins, KS #20617
>   Mathew R. Crimmins, KS #20707
>   CRIMMINS LAW FIRM, LLC
>   214 Spring Street
>   Independence, MO   64050
>   Office: (816) 974-7220
>   Fax:    (855) 974-7020
>   v.crimmins@crimminslawfirm.com
>   m.crimmins@crimminslawfirm.com
>   **ATTORNEYS FOR PLAINTIFF**

I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants:

>   None

>   SLOAN, EISENBARTH, GLASSMAN,
>       MCENTIRE & JARBOE, L.L.C.
>   534 S. Kansas Avenue, Suite 1000
>   Topeka, KS    66603
>   Office: (785) 357-6311
>   Fax:     (785) 357-0152

>   s/ Stephen D. Lanterman
>   Stephen D. Lanterman, KS #18844
>   slanterman@sloanlawfirm.com
>   **ATTORNEYS FOR DEFENDANTS**