# JEAN SANCHEZ

1   .

2                      UNITED STATES DISTRICT COURT

3                       FOR THE DISTRICT OF KANSAS

4   .

5   .

6   KATHRYN HEUERTZ,

7            Plaintiff,

8   .

9       vs.              Case No. 2:19-cv-02756-KHV-GEB

10  .

11  CAREGIVERS HOME HEALTH,

12  et al.,

13           Defendants.

14  .

15  .

16  .

17                   VIDEOTAPED DEPOSITION OF

18                       JEAN SANCHEZ,

19  taken on behalf of the Plaintiff, pursuant to

20  Notice to Take Deposition, beginning at 9:31 a.m.

21  on the 1st day of February, 2021, taken via web

22  conference, before Terri L. Huseth, Kansas CSR No.

23  1355, Missouri CCR No. 660, RPR.

24  .

25  .

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

JEAN SANCHEZ

1   retention of good staff is important?

2        A.   That is preferred for sure.

3        Q.   In your experiences, is it also important

4   to document discussions with employees in writing?

5        A.   It depends on the situation.

6        Q.   Are you familiar with progressive

7   discipline policies?

8        A.   In general, yes, the theory, you know.  I

9   don't know if you're talking about anything

10  specific.

11       Q.   No, just the theory at this point.  Does

12  Caregivers have a progressive disciplinary policy?

13       A.   Partially from what I understand.  It can

14  -- it depends on the situation, so employees are

15  at will particularly within that first 90 days.

16  So there are some -- there's some guidance about

17  that as well.

18       Q.   And what is the guidance about that?

19       A.   Depends on the situation and what the --

20  the issue is with regard to the employee, whether

21  or not you have to do certain steps or not.

22       Q.   Okay.  And do you know what those

23  requirements are?

24       A.   I don't have those off the top of my

25  head.  I would have to -- there's a document that



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

### JEAN SANCHEZ

1    Q.   It does; it does.  As long as I told my

2    manager, that's what I need to do, and Caregivers

3    is flexible, you want safety first; is that a fair

4    summary of what you're saying?

5    A.   Absolutely.  Absolutely.

6    Q.   And how are days accrued in this PTO

7    system?

8    A.   So I'm not sure the exact calculation,

9    but again, it's, you know, it's accrued over time.

10   And you don't get to take it -- even though it's

11   accruing you don't get to take it until 90 days,

12   after 90 days.

13   Q.   And can I take it in advance?  So let's

14   say I worked there for a year and I want to take

15   a one-week vacation the first week of January.  Am

16   I able to either build up my time from the prior

17   year or take PTO time from, you know, the future?

18        MR. LANTERMAN:  I'll object to form.  But

19   go ahead.

20   A.   You have to have your PTO, or ETO is what

21   we call it, in order to take it.

22   BY MS. CRIMMINS:

23   Q.   Okay.  And what do you call it, ETO?

24   A.   ETO, uh-huh.  Employee Time Off I think

25   it stands for.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                Suite 101                   Suite 305
785-273-3063            Overland Park, KS 66212          Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JEAN SANCHEZ**

1  to the very first page here, where it says

2  attendance.  And I don't know if I can -- let me

3  see if I can highlight this for you to make it

4  easier.  I want to look at this sentence here.

5  Are you able to read that?

6      A.   Yeah.

7      Q.   Okay.  So it says unnecessary absenteeism

8  and lateness are expensive and place an unfair

9  burden on other employees.  Did I read that

10 correctly?

11     A.   Yes, you did.

12     Q.   Okay.  I'll take that off so we don't

13 (inaudible).  What is an unnecessary absence?

14     A.   I would say anything that could be

15 interpreted as being unnecessary and, you know, I

16 think the point is that absenteeism is tough on a

17 business, especially a small business.

18     Q.   So when we were talking earlier this

19 morning about inclement weather and if a manager

20 said to an employee, okay, you can be off, the

21 roads aren't safe, we understand, would that be an

22 example of a necessary absence?

23     A.   I would say more of an approved situation

24 in that they're going to be there just when it's

25 safe to do so.

## JEAN SANCHEZ

1    A.   Not that I can think of at this time.

2    Q.   But other than these umbrella situations

3    is it fair to say that Caregivers' policy is to

4    engage in a progressive discipline policy to give

5    employees the opportunity to correct and improve

6    behavior?

7        MR. LANTERMAN:   I'll object to form.   Go

8    ahead.

9    A.   It's not our policy, no.   We can take it

10   on a case-by-case basis.

11   BY MS. CRIMMINS:

12   Q.   And how do you decide which cases to

13   implement progressive discipline versus not

14   implementing progressive discipline?

15   A.   It depends on the severity, for example,

16   and also if the conduct cannot be corrected, for

17   example.

18   Q.   So this last sentence of the policy says

19   if you feel disciplinary action has been unfair,

20   you may contest it through the dispute resolution

21   program; do you see that sentence?

22   A.   I do see that.

23   Q.   Are you familiar with the dispute

24   resolution program?

25   A.   Not as an official program.   So it would



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## JEAN SANCHEZ

1        Q.   Okay.  So when Ms. Heuertz started

2   working at Caregivers in December 2018, what was

3   your involvement with her?

4        A.   Very limited.  I mean, I was a part of

5   the interview.  Of course, I enter time for the

6   office -- well, they enter their time and I

7   approve time for the office staff, you know, after

8   I reviewed it.  I can recall a couple of times

9   her stopping by my office just -- but I don't

10  remember the reasons exactly so very, very

11  limited.

12       Q.   You did not have any day-to-day

13  supervision responsibilities over Ms. Heuertz?

14       A.   No, that was Patty's role.

15       Q.   Did you ever socialize outside of work

16  with Ms. Heuertz?

17       A.   No, not with anybody.

18       Q.   Okay.  And that's perfectly fine.  Just,

19  you know, every place is different.  Were you

20  Facebook friends with Ms. Heuertz?

21       A.   No.

22       Q.   Were you involved in Ms. Heuertz's

23  training or onboarding process?

24       A.   Not about her exact job experiences

25  because that, again, wasn't anything that I would

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2021                                                             80

**JEAN SANCHEZ**

1   be involved in.

2        Q.   Do you know who would have been involved

3   or responsible for her training?

4        A.   Heather would be a part of it.  She might

5   have delegated it.  I don't know.

6        Q.   On a weekly basis how frequently would

7   you typically communicate or talk to Ms. Heuertz

8   in the office?

9        A.   I would have a difficult time quantifying

10  that.  It's a small office.  So would I see her?

11  Of course I would see her occasionally.  I don't

12  think we had regular communication.

13       Q.   Okay.  And do you know what Ms. Heuertz's

14  job duties were?

15       A.   I have a general idea, but I would have

16  to defer that to her supervisor, would be better

17  equipped to answer that.

18       Q.   Why don't you tell me generally what you

19  understood her job responsibilities were.

20       A.   I know that job requires some filing, it

21  requires some checking in of paperwork.  Beyond

22  that I really can't tell you much more for that

23  particular job.

24       Q.   Did you ever communicate with Ms. Heuertz

25  about her job expectations and what it was she was

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JEAN SANCHEZ

1  an update on Katie, was that the email we

2  previously just looked that?

3       A.   Yeah, I was referencing that.

4       Q.   I'm sorry, can you repeat that answer?

5       A.   Yeah, I would assume that would have been

6  referencing that email, particularly since I think

7  it was the day before if I see the -- or the day

8  of.

9       Q.   So Exhibit 56 was January 28, at 10:02?

10      A.   Uh-huh.

11      Q.   So Exhibit 55, 28th, at 12:58 so two

12 hours later?

13      A.   Yeah.

14      Q.   Was there any kind of time sensitivity as

15 to why you needed an update on Ms. Heuertz?

16      A.   I don't recall there being a time

17 sensitivity.

18      Q.   And Ms. Fisher responds to you on January

19 28, 2019, at 1:59 p.m., and says, I have nothing

20 new on Katie, still planning on following up with

21 her and you in a couple weeks unless major change;

22 did I read that correctly?

23      A.   Yes.

24      Q.   What did that mean to you at the time?

25      A.   I would say that she would have continued

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JEAN SANCHEZ

1   to work on what they were working on with regard

2   to the meeting, and then just follow-up with me.

3       Q.   Okay.  So a couple weeks would have been

4   mid-February; is that accurate?

5       A.   I would say yes.  I would say 14 days

6   after that, I would assume would be approximate.

7       Q.   Okay.  And then you, the next day, it

8   looks like sent an email to Patty Fisher again

9   with a cc to Heather Strecker.  And write, with

10  regard to Katie I would like to meet to discuss

11  her status next Monday, 2/4, sometime in the

12  afternoon.  Let me know what time works best for

13  you; did I read that correctly?

14      A.   You did.

15      Q.   Why was it so important to meet earlier

16  than the time frame suggested by Ms. Fisher?

17      A.   You know, I don't recall.

18      Q.   Did you meet on February 4th with Ms.

19  Fisher and Ms. Strecker?

20      A.   Well, I don't remember if it was with Ms.

21  Fisher and Ms. Strecker, but if we said we were

22  going to do it, it's possible we did.  Again, I

23  have trouble recalling that far back on specific

24  dates.

25      Q.   And if you scheduled this kind of meeting

### JEAN SANCHEZ

1  previously, in a timely fashion.  Probably talked
2  a little bit about attendance because there was a
3  significant amount of time, un- -- naturally, for
4  someone who had been there such a short period of
5  time, less than 90 days.  Typically you see -- you
6  don't see that very often.
7       Q.   And was a lot of that attendance issue
8  related to the inclement weather that was being
9  experienced?
10      A.   It was a combination of various different
11 things.  And more -- more importantly was the lack
12 of catching onto the job function.  That was more
13 concerning to me.
14      Q.   Okay.  Tell me -- tell me what she wasn't
15 catching onto.
16      A.   What was reported to me was just an
17 inability to complete very basic tasks for that
18 job.  Specifically could I tell you?  No.  I
19 could say it possibly related to filing and part
20 of that gathering of information for charts that I
21 told you about earlier.
22      Q.   When -- when were these -- when did you
23 have these communications where you learned she
24 wasn't being able to perform tasks or catching
25 onto the job tasks?



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

## JEAN SANCHEZ

1      A.    For sure when they told me about that

2 meeting that we just talked about a little while

3 ago when I did the follow-up after.

4      **Q.    Okay.**

5      A.    Those were the things they identified

6 that they would chat about in the meeting.

7      **Q.    And what type of help was Ms. Heuertz**

8 **given to catch onto the job or learn how to**

9 **perform these job tasks?**

10      A.    I would have to defer that question to

11 Patty for the specific assistance she was given

12 for training for the job.

13      **Q.    So really the focus on the February 4th**

14 **meeting, or whenever this was in early February,**

15 **we're not 100 percent certain of the date, would**

16 **have been on her job performance; is that fair?**

17      A.    That would have been correct.

18      **Q.    Okay.  And you don't know what was being**

19 **done to help Ms. Heuertz allegedly improve the job**

20 **performance issues, right?**

21      A.    I don't recall at the time.  Possibly

22 they could have shared that information, but I

23 don't recall that.

24      **Q.    Would they have put in writing the steps**

25 **they wanted Ms. Heuertz to take to improve her**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JEAN SANCHEZ

1    alleged job performance?

2        A.   I would again have to defer you to them.

3        Q.   Okay.  Did Ms. Heuertz have a set

4    schedule that she was supposed to work?

5        A.   You know, for the most part, yes.

6    Typically, office staff, we have to cover a period

7    between, say, 8:00 and 4:30, I think it's

8    officially 8:00 to 5:00, so we have some office

9    staff who come in, you know, early and then

10   they're done a little bit -- like say 4:30.  So

11   it's like a 30-minute window, but that's always

12   defined with the supervisor previously so we don't

13   have any gaps in there.

14       Q.   What was her set schedule that she was

15   supposed to work?

16       A.   I don't recall Katie's set schedule.

17   That I would defer to Patty as well.

18       Q.   How would the schedule have been

19   communicated to Ms. Heuertz?

20       A.   Well, she would have received approval

21   from Patty, her supervisor, to have a specific

22   schedule.

23       Q.   Have you ever heard an employee be told

24   that schedules can be flexible as long as you are

25   getting your job done?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**95**

## JEAN SANCHEZ

1      A.   I don't know that that terminology

2  specifically has been used.   I think using the

3  term, you know, flexible in that maybe there's a

4  30-minute window.   Let's say you are more of an

5  early person and you want to come at 7:30 and

6  leave, you know, at, say, 4:30, then that -- in

7  reference to that that's possible, yes.

8      Q.   All right.   And I know you said you had

9  some responsibilities for tracking attendance,

10  let's just take a look at what's been marked as

11  Deposition Exhibit 13.   And I will flip through

12  this again but I assume you're familiar with this

13  document?

14      A.   Yes, I am.

15      Q.   What is Deposition Exhibit 13?

16      A.   So that's the time how it looks in

17  Chronos when they clock in, for example, and out.

18      Q.   Okay.

19      A.   That's what it shows us.

20      Q.   Okay.   And this -- we've got a red mark

21  here, Monday, 12/3, there's a red mark by 8:20

22  a.m.   Do you know what those red marks mean?

23      A.   I don't.

24      Q.   Okay.   And then there's little tiny

25  arrows, like I'm guessing the M -- I don't know

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

JEAN SANCHEZ

1    know and I believe that Patty did communicate that

2    to her, per Patty, and understanding how she works

3    with her team.

4         Q.   And how would you have expected Katie to

5    know this job?

6         A.   She would have been trained by Patty,

7    possibly by other people back there who also did

8    some of the same tasks.

9         Q.   Do you know how Patty conducted her

10   training?

11        A.   Not specifically.  I don't know

12   specifically how she conducted it.

13        Q.   Okay.  So you and Patty made the decision

14   to terminate Ms. Heuertz's employment.  Before you

15   terminate an employee do you have to get approval

16   from corporate HR?

17        A.   I don't have to get approval from

18   corporate HR.  We don't have to get approval.  I

19   think I may have probably talked to Ed about it.

20   That would have been typical, especially back

21   then, but I don't recall that exact conversation.

22        Q.   Okay.  Why do you think it would have

23   been typical for you to talk to Ed about it?

24        A.   Just because I'm kind of the type of

25   person that doesn't want anybody to have surprises

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JEAN SANCHEZ

1  situation like that.  So yes, I would not make a

2  unilateral decision.

3      Q.    Okay.  And do you have any notes,

4  handwritten or typed notes about this decision and

5  the specific date it happened?

6      A.    Not that I recall, but if I did, I would

7  have provided those in the initial discovery.

8      Q.    Okay.  Do you remember what day of the

9  week of February 11th, the termination decision

10  occurred?

11      A.    I have no idea.

12      Q.    Okay.  So it could have been any day the

13  week of February 11th?

14      A.    It could have been.  I'm sure that's

15  documented somewhere.  Well, it is for sure

16  because it's on that termination document that we

17  -- that Katie signed.  The day she was terminated

18  is on there.  Is that what you mean?

19      Q.    The day you made the decision to

20  terminate her.

21      A.    Oh, no.  I wouldn't remember that.

22      Q.    Would you have documented that anywhere?

23      A.    I don't think I would have documented

24  that --

25      Q.    Okay.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**111**

### JEAN SANCHEZ

1          A.    -- that I can recall.

2          Q.    Okay.  And was there -- this letter

3     references that you wanted to terminate Ms.

4     Heuertz during the week of February 11th.  But she

5     had several absences which did not allow -- I

6     highlighted the wrong sentence -- for a meeting.

7     Is there a specific day that you wanted?

8          A.    I do recall that actually happening

9     because we were -- again, I was planning to try to

10    schedule something with her, but I don't remember

11    the particular day.

12         Q.    Okay.

13         A.    But there were some absences so we had to

14    push it.

15         Q.    Would you have typically terminated an

16    employee like on a Friday, or Monday is typical?

17    Do you have a practice?

18         A.    I don't have a specific practice.

19         Q.    Okay.  Would you have had any notes about

20    which day you were wanting to make the termination

21    official?

22         A.    According to what we gave, I wouldn't

23    have made any.  I don't recall.

24         Q.    I'll take the highlighting off this so we

25    don't get ourselves confused if we need to look at



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

### JEAN SANCHEZ

1  progressive discipline.  Is this the form you were

2  referencing that's got kind of the categories?

3       A.   Part of it, yes.

4       Q.   Is this it?  I'm sorry.

5       A.   This is part of it, yes.

6       Q.   Okay.  And were any similar forms created

7  in relation to Ms. Heuertz, a written warning?

8       A.   You're asking me were there any other

9  forms created?

10      Q.   Yes.

11      A.   Not by me, no.

12      Q.   To your knowledge, by anybody else?

13      A.   Not by -- not by anybody else to my

14  knowledge.

15      Q.   Okay.  This individual is not meeting

16  basic employment expectations and has had

17  excessive absences.  Per employee code of conduct

18  individual demonstrates inefficiency in

19  performance of assigned duties.  Are you able to

20  tell me what assigned duties Ms. Heuertz was

21  inefficient in?

22      A.   It would have been back to what you at

23  least discussed earlier about, for example,

24  gathering documents needed for the charts, filing,

25  things of that nature.

### JEAN SANCHEZ

1    A.    And then at that time I probably would
2  have been part of the interview process.  If it
3  wasn't me, it was typically Heather who sat in,
4  whoever, you know, was available with the office
5  staff.  So I would have been part of that.
6    Q.    Okay.  Do you recall the name of the
7  person that took Ms. Heuertz' position?
8    A.    I believe it was Irasema Swope.
9    Q.    Okay.
10    A.    But again, please confirm that with
11  Patty.
12    Q.    And did you interview Ms. Swope?
13    A.    I believe I was in on the interview with
14  Irasema, yes
15    Q.    And who would have been responsible for
16  that hiring decision?
17    A.    Patty would have, you know, if she was
18  the supervisor, would have been, you know, able to
19  give the yea or nay, this person seems like a good
20  fit.
21    Q.    Would you have had any involvement in
22  that decision?
23    A.    I could give her input if I, you know,
24  felt either way.  Patty and I usually agreed for
25  the most part on hiring decisions.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2021                                                              144

## JEAN SANCHEZ

1          A.    Yes.
2          Q.    And is that an indication that Ms.
3    Heuertz received that document and signed off on
4    it electronically?
5          A.    Yes, through the HealthcareSource, HCS,
6    that I talked about.
7          Q.    And on the second paragraph it says,
8    these policies are only guidelines, they do not
9    represent an employment contract and should not be
10   viewed as such; do you see that?
11         A.    Uh-huh.
12         Q.    Can you tell me what your understanding
13   of that language means.
14         A.    Yeah.  There is, again, no -- this is a
15   general guideline.  There's no specific contract
16   of employment and the employees are considered at
17   will.
18         Q.    Now, Ms. Heuertz was not a -- she was not
19   with Caregivers for an extended period of time; is
20   that correct?
21         A.    That's correct.
22         Q.    I think you referenced that she was a
23   probationary employee; is that right?
24         A.    That is correct.
25         Q.    What is your understanding or your belief



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JEAN SANCHEZ**

1    as to what a probationary employee is?

2         A.    My belief is that the information for

3    each specific instance can be obtained, that if a

4    person is not able to perform their job in the way

5    they should be able to as needed for the office,

6    we're able to let them go.

7         Q.    In other words, you look at them for the

8    first 90 days to see if they're going to do the

9    job?

10        A.    Yeah, we look at them for the first 90

11   days.  We continue to look at them, but yes,

12   definitely for the first 90 days.

13        Q.    And what was your opinion as to Ms.

14   Heuertz's ability to perform the job she was

15   assigned at the end of that first 90 days?

16        A.    As I said, based on the information I

17   received she did not appear to be grasping some of

18   the basic concepts with regard to gathering data

19   for the charts, filing, and there were a large

20   amount of absences.  Very unusual for someone that

21   just started.

22        Q.    Did the fact that Ms. Heuertz was

23   pregnant impact your decision to terminate her in

24   any way?

25             MS. CRIMMINS:  Objection, calls for a

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2021                                                          146

### JEAN SANCHEZ

1   legal conclusion.

2        BY MR. LANTERMAN:

3        **Q.    Go ahead.**

4        **A.    Absolutely not.**

5        **Q.    Have you had other employees at**

6   **Caregivers that have been pregnant during your**

7   **tenure as the director for Caregivers?**

8        **A.    Yes.**

9        **Q.    And have you terminated any them because**

10  **they were pregnant or needed time off because of a**

11  **pregnancy?**

12       **A.    No.**

13       MS. CRIMMINS:  Objection, calls for a

14  legal conclusion.

15       BY MR. LANTERMAN:

16       **Q.    And as I understand it, Ms. Sanchez, you**

17  **testified earlier that the decision to terminate**

18  **Ms. Heuertz was yours?**

19       A.    Ultimately.

20       MS. CRIMMINS:  Objection, misstates the

21  witness's testimony.  Go ahead.

22       BY MR. LANTERMAN:

23       **Q.    Let me ask it this way.  Was the decision**

24  **to terminate Ms. Heuertz your decision?**

25       **A.    Yeah, ultimately it was.**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**specific documentation about Ms. Heuertz's alleged performance?**

A. I don't believe I received anything in writing, but I did receive it verbally.

**Q. Okay. And what kind of performance metrics information did you receive about her performance?**

A. Only just communication and again I think that's a really good question for Heather or Patty as they were in that meeting so they would know more about that.

**Q. Well, but I can only ask you about what you've now based the ultimate decision on, which is the information you received. So this is my opportunity to get details about that information that you received and that form the basis of your decision.**

A. Yeah, it would be again in conjunction with the team, getting feedback from them, but I guess I'm looking at it like I have to be the one who ultimately says here's where we go for now, I'm kind of thinking of myself as the captain of the ship. I don't want to, you know ...

**Q. And that's fine, but what information did you rely upon in making the decision? Because as**



JEAN SANCHEZ

1    A.   And just not being able to do the amount
2    of work that was necessary for that job.
3         Q.   And how much work was necessary for that
4    job?
5         A.   I think it depended on what the specific
6    function was.  Obviously filing should be able to
7    be done in a very timely manner.
8         Q.   What was the job expectation that she
9    failed to meet?
10        A.   Pardon me?
11        Q.   What was the job expectation that she
12   allegedly failed to meet?
13        A.   She wasn't able to conduct the basic
14   functions of the job, like getting information
15   into the chart in a timely manner for example.
16   Collecting that data.  I do recall that Patty
17   talked about a number of -- what would be normal
18   for a person to do with regard to, you know,
19   audits.  I don't remember the specifics of that,
20   but I think she used that to kind of illustrate
21   for me what was happening.
22        Q.   How soon does some information or data
23   need to get into the chart?  What's this timeline
24   you're referencing?
25        A.   Well, it depends on the chart, depends on

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JEAN SANCHEZ

1      A.    Lutz.   L as in Lucy, U T Z.

2      **Q.    And when was Ms. Lutz pregnant?**

3      A.    She was pregnant -- oh, boy.   I'm going

4  to say in the 20 -- I don't remember, 2020 time

5  frame.

6      **Q.    What is her job title?**

7      A.    She's an RN.

8      **Q.    And how about Jenna Cochran, when was she**

9  **pregnant?**

10     A.    Jenna Cochran is currently pregnant.   She

11  is an RN.

12     **Q.    And Irasema Swope, when was she pregnant?**

13     A.    She was pregnant -- I'm not going to be

14  able to tell you the dates, but it was in that

15  time frame right after she started, so within the

16  first three months.   I can't remember.

17     **Q.    Okay.   And is she currently employed with**

18  **Caregivers?**

19     A.    No, she moved out of state.

20     **Q.    When did she leave?:**

21     A.    I knew you were going to ask me and I

22  don't recall that.

23     **Q.    Before or after she had her baby?**

24     A.    Before she had her baby.

25     **Q.    So just so I am clear, the information**